All right, please call the next case. The next case is Oralia Juarez-Coronado v. Jefferson B. Sessions. All right, Mr. Anderson, you may proceed when you're ready. May it please the Court, my name is Thomas Anderson. I'm here on behalf of my client, Oralia Magali Marroquin, formerly known as Oralia Magali Juarez-Coronado. And in starting, I've been anticipating that the first thing that's going to come up as a question today is regarding the Attorney General's new case that was issued in June of this year, a matter of AB. And I wanted to first start by touching on that case a little bit and then go back to our case at hand. So it's, I think, one of the burdens of immigration law is that we have quite a bit of flux as to case law and having the Attorney General being able to step in and have significant change. This case arose under the law of matter of ARCG, which allowed for a married woman in Guatemala who was unable to leave her relationship to demonstrate that and pursue and be granted asylum. And the facts of the case, my case today, is that we have an unmarried but partnered woman in Guatemala with a child who is also unable to leave her significant other and also is indigenous. We fast forward to June of this year with matter of AB, and the Attorney General took it upon himself to issue a sweeping decision indicating that cases similar to matter of ARCG should not be approved. The language in the matter of AB case is fairly stringent. But at the same time, it suggests that it's reaching beyond just the case itself as to calling into question any and all domestic violence-related claims. And so I begin by reminding the Court that the cases like this are always done on a case-by-case basis and that no matter what the Attorney General can state in a brief, in a decision, it's still a requirement that we go through each case on an individual basis. So in this case, we at the trial court level present a testimony regarding my client's victimization as a result of domestic violence. Having suffered from her testimony referenced 14 different instances of domestic violence, she testified to pervasive and consistent domestic violence that not only was something she couldn't escape from, but was essentially condoned by her own family. If I understand it correctly, the Immigration Court decided this case on whether the Guatemalan government was able or unable to protect her, right, not on the recognizable social group? I think that's correct, that the Immigration Judge looked at the case, and after reviewing the facts, was disinclined to follow the case law in matter of ARCG, which brings to question the terminology, which is unable or unwilling. The government today is likely to argue and would have us believe that this standard of unable and unwilling should be construed as complete helplessness, or that the government is 100% unable to do anything, if we contemplate the concept of complete helplessness that they reference in their brief. In this case, the Immigration Judge looked at the facts, looked at Ms. Juarez having pursued help from the police, having received an order of protection or its similarity in Guatemala, and that even after the issuance of the order for protection, she continued to be subject to persecution, that her domestic partner continued to pursue her. And we posit that that consistency, that her domestic partner continuing to follow her, continuing to show up at her house, continuing to pursue her, demonstrates, in fact, that the government of Guatemala, while they may pay lip service, while they may have issued a protective order, but they actually are unable to appropriately provide protection. And I think that brings the main question to this Court, which is when we get back to the case law in matter of ARCG, we see the Department of Homeland Security, we see the Board of Immigration Appeals trying to deal with this big question of how do we address domestic violence? How does the U.S. government handle domestic violence cases and not just say nothing, not just straight up deny every single case? I think the Attorney General in the most recent case, matter of AB, would have us deny every single domestic violence case. Well, counsel, I want to ask you, I mean, I agree with you that the response of the Guatemalan government wasn't particularly effective because she continued to be abused, and obviously that's very problematic. But when you use the word unwilling or helpless, I'm not sure that it rises to that standard. I'm not sure what the government's exactly going to argue, but the fact of the matter is you have a restraining order and you have twice that, you know, the police, once she called, the police went out and looked for the abuser. And again, not effective because they didn't put a stop to it, but it does show some willingness and a lack of helplessness on the part of the Guatemalan government to help. So what do we do with that? Well, I think we look at, for starters, we definitely address this on a case-by-case scenario, because I think one of the concerns is if you leave a broad-based, for example, broad-based political social group and say that just any person suffering from domestic violence is going to get status, that's going to open the floodgates. And that's not what we're asking. We're asking a very specific review of this circumstance where we have, as mentioned, we've got the government of Guatemala having issued a protective order, but as you indicated, it didn't really work. And what do we do? What does the court system do when a person pursues assistance from their own government and it doesn't work? And how much do we ask of an individual applicant? How much do we ask of that person to stay home or to stay in the shadows or to wait out the possibility of further future and more severe harm? But on the other hand, I mean, I don't mean to blame the victim at all, but one of the problems with this case is there were 14 incidents of domestic abuse, and she called the authorities twice. And it's impossible to know what might have happened had she invoked the authorities and tried to have the authorities put a stop to the abuse those other times. And so we have a little bit of a different scenario here in which the victim didn't sort of seek the help of the government in every scenario. So what do we do with that? Well, I think we have to look at it through the lens of each individual on a case-by-case basis, and I think we have to look at it through the lens of the country and the country conditions. And the case matter of AB doesn't go back and just erase everything in ARCG. The court in matter of ARCG talked about Guatemala having a pervasive issue with domestic violence and a machismo culture that supported and allowed for domestic violence. And we see that here in this case. We see that with her father essentially permitting or condoning domestic violence and suggesting that she return with her partner even though and knowing that she had been through instances of domestic violence. So in looking through the culture of the case itself, we see a person who is surrounded by a permissive environment of domestic violence. And so we say, is it normal, is it expected that on 14 different instances that there would be 14 different police reports? I mean, we don't even see that in the United States. I mean, the question is how many steps, how many moments of domestic violence have to occur, even here in the United States, before a person pursues help with the police. And I think under the view of this case, we can see that she did take significant steps. And I think that significantly distinguishes this case from the Eighth Circuit in Fuentes Arazo. Earlier this year, the decision in Fuentes Arazo v. Sessions discussed a Honduran woman, if I recall correctly, who had been the subject of domestic violence but then had a gap of five years. So the relationship ended. The applicant was able to flee her relationship, start a new relationship, have a new child, five years go by, then enter the United States and then pursuing status. That's not what we have here. We have a very, very distinct case in that we have consistent issues with domestic abuse. We have an individual who leaves her hometown, flees to the capital, lives in the capital for a period of months, doesn't inform her abuser where she lives, and then she's found. Her testimony indicates how he had found her in the capital, seen her on the street. They ended up getting back together, and the abuse continued. Is there anything in the record about why she didn't go to authorities? For example, from what you've described as the difficulties for someone in her position to do that, is there anything in the record about that? I don't believe there's a specific response as to why she did not. Should IJ expect that kind, even an explanation for the kinds of things that you're talking about as to why the 12 times she just felt it was fruitless, for example? I think we start that question or analysis with did she go to the authorities? And we do see quite a few cases where an individual comes in and can claim and does so for having been a victim of domestic violence without having gone to the authorities. Here we have instances where she did go to the authorities and where the assistance, the trip to the authorities occurred after an extended period of abuse, I should note. And so after pursuing help from the authorities, she even indicated that she thought they might be able to help. But the reality is, did they? And I think that's what the question comes up, is evaluating does the law require complete helplessness in the sense that even if she goes to the authorities, which she did, even if she follows up with the authorities, which she did, do we have to demonstrate 100% they can't help her or are we required to demonstrate that they're essentially unable? And that in the statute, it talks about the government being unable or unwilling to help an individual. And it doesn't use the language of complete helplessness. There's a significant distance between unable and complete helplessness because of the concept of a person who is pursuing help. And if the government takes a number of steps, we just can't provide the protection needed. So I think when we look at this case, and in my last few minutes here, I think we have to first evaluate, does this case demonstrate where the government has been unable to help her? And I believe it does. Does this case demonstrate a social group that still qualifies as a social group, even after the decision and matter of AB? And I believe also that we have a social group demonstrated, and that in this case would be the partnered indigenous Guatemalan woman who has suffered from domestic abuse. And the case matter of ARCG does reference there is a significant history in Guatemala of domestic violence and that the government has had significant problems in offering protection. So by coming forward with the case matter of AB, the Attorney General is in effect trying to stem the tide of domestic violence cases, but is doing so in such a broad stroke that it smells like that decision is trying to influence the court system in denying every single case. And I think when we look at this case, we have to evaluate it on its facts, evaluate on the steps that the applicant here took, the severity of the harm that she suffered, and then her efforts to provide testimony. I should note, and we didn't get into this at the BIA level, but the record begins with the immigration judge being quite hostile to the respondent in this case. So the case begins with initial questioning and immediately moves into a fairly direct and hostile evaluation of the case by the immigration judge. And I think that demonstrated a bias. But I think our main focus in this court today, and I think if we could sum it up in one minute, would be that she has demonstrated that she took steps to protect herself. She's demonstrated that she's been the victim of harm and that she's demonstrated that the government, even if she takes steps to protect herself, that the government wasn't able to help her and that the government couldn't provide the help to keep her from future harm, couldn't provide her with the assurance that she would not suffer additional abuse. So in that case, I'd ask the court to approve the matter. Also, considering that the case law and matter of AB is very recent, I have been contacted and been in conversations with American Immigration Lawyers Association, who have suggested the possibility of providing additional amicus supplementary briefs should the court request it regarding the matter of AB case. Thank you. Thank you, counsel. Mr. Stoltz. Good morning, Your Honors, counsel, and may it please the court. The issue today isn't a matter of AB. It's not a matter of ARCG. The issue today is whether Petitioner met her burden to demonstrate that the government in Guatemala was unable or unwilling to help her to protect her from the deplorable harms caused by her partner, which we in no way minimize. But the fact of the matter is the government was able to help her, and in fact Petitioner concedes the government was willing to help her. At least in their brief, they wrote, it is not that the government is unwilling to intervene, but that they have been and are unable to control Melvin. So the unwillingness problem has already been conceded. They were willing to help her, so the question before us is whether they were able to. And the answer to that question is every single time she asked for help, they helped her. And we can distinguish her case from the country reports that suggest that domestic violence victims in Guatemala can't seek help. Petitioner was able to seek help. She was able to go to the police, and they believed her. They treated her with respect. Before a judge, she got an ex parte judicial protective order that told Melvin to stay away from her. That is government ability to help her. Those are initial stages of help, but it doesn't really answer the question of follow through. So you can issue a restraining order, but if there aren't individuals within the government that are willing and able here to enforce it, or you can call the police, and they can come and be willing to help, but if they really don't have the resources to help you find the person who is causing this harm and make you feel safe, isn't that a next step that you'd have to really dig down into, that it can't be just the superficial we're here and would like to help? I agree. It shouldn't be. So let's look at what happened here. After she got the judicial protective order, she called the police twice, and they came running, and they chased Melvin away both times. But she didn't go back to the court and say, he's violating the order. That's the next step, which you're talking about, this process to say, hey, why didn't she go to the judge who reminded her when she received the protective order, said, hey, you can come back. The protective order itself says, we're notifying the local police departments. That was the next step, to say, hey, the abuse is ongoing, because they demonstrated they were willing to help her. How can we then jump to say, well, I guess they weren't able when they didn't know about it. She had to go back to them and accept their invitation to say, hey, we will help you. Let us know when Melvin comes around. They chased him away twice. They didn't catch him. And she was specifically asked, she was asked, what do you think would happen? Could Melvin be arrested or imprisoned? And she said, yeah, well, maybe. She said, maybe they could put him in jail. A suggestion, I think that, yes, the government in Guatemala was able to do more to help her if she would reach out to them. They can't obviously arrest him if they don't know that she's violating the protective order. She says she didn't tell her family. She says she didn't tell anybody that he was violating the order. But at that point, the government had already demonstrated they were able and willing to help her, if only, really, she could tell them. I don't want to put the burden entirely on her, but at that point in this particular proceedings, at that point, the government had said, we will help you. And at that point, she needed to turn to them and say, okay, we can help you. And that is distinct, as I said, from the country conditions evidence and some of the other cases that are cited where, yes, women in Guatemala have a really tough situation and they can't get police help because police dismissed their claims. That's not this case. In this case, the police believed her and said that we would help you. And the judge believed her and said that we will help you. And instead of availing herself of that option, she came to the United States. That's why this case isn't appropriate for a grant of asylum, because at the 10,000-foot level, it lacks that either action or inaction by the government that qualifies a person from asylum. Either the government has to be the source of the persecution or they've got to be unable or unwilling. In the language of this court, they have to condone it or be completely helpless to prevent it. And that's not present here. Here, they didn't condone it and they weren't completely helpless to prevent it, and therefore, she doesn't qualify for asylum. I have a question about the role of the country reports. And here, you say that the country reports would support her assertion that the Guatemalan government is just not able to assist women in these situations? In general. In general, but that she's sort of an exception to that and thus cannot show that they wouldn't protect her. Does the flip happen? And maybe this isn't necessarily relevant for this case, but I'm guessing then if there was a country report that said generally the government is able to help, in this case, women in this kind of situations, but an individual petitioner came forward and said, well, that may be the country, but they haven't been helping me in these 10 or 12 times. Would that be something that the government would believe was proof enough to show as to this individual person the government is unable to help them? Yes, Your Honor. While the country conditions reports and actually all the evidence has to be considered, it's important to be considered, the individual circumstances of each individual applicant has to be taken on a case-by-case basis, which I believe my brother counsel pointed out. In a case like that where somebody has come forward and said, well, the country report is different than the country report, please believe me. Well, obviously, you have to take their testimony, especially if they're credible. In this case, we assume petitioner's testimony is credible because the board didn't affirm the immigration judge's adverse credibility ruling. So we must take her at her word that she was able to seek police help, that they believed her, and that she was able to get the judicial protective order. I want to just respond to the idea that she took significant steps, my brother counsel said, which is true, but that's not the focus of our inquiry. The inquiry here is what the government was able and willing to do. And here they were able to send out police and chase Melvin away on two occasions. They were able to issue the judicial protective order, which alerts the local police departments to be on the lookout. And I might add, by the way, that Melvin himself thought that the judicial protective order had some force, right, because he told her that he wanted that lifted because he was afraid that he was going to go to jail because of it, suggesting that they weren't completely helpless. I mean, there is some ability here, at least to the point that Melvin was afraid of the judicial protective order. And finally, to the extent that my brother counsel mentioned that he disagrees with her, thinks that the condone and completely helps to protect language, that is this court's precedent that he disagrees with it. I mean, it would take overturning this court's precedent to go further than, I guess, the condone or completely helpless language that is the standard in this circuit. So I urge you to reject that option. If there are no other questions, Your Honors, I won't belabor the point. I guess not. Thank you for your time. All right. Does counsel have any time remaining? All right. You've run out of time. Take two minutes and wrap up if you want to. Okay. Thank you, Your Honor. I think very quickly the concern that I have is this question of how did the government help? And so that's where we get into evaluating this claim is if she takes the step to pursue assistance from the government, if the government issues a protective order, then did that allow her a level of safety? How consistent was that? Apparently, and in the record, Melvin was never arrested. There was never any consequence applied. And the harm, the pressure, the persecution continued. And I think that's a primary issue in this case is that we have met many of the steps that we don't see in other cases, where an individual has taken steps to ask for assistance and gotten a level of assistance from the government, but the assistance is ineffective. It's simply it did not offer her the protection that she needed to avoid future harm. And having been through multiple instances of harm in the past, she had every reason to believe that she would continue to suffer the same harm going forward. Thank you. Thank you. Thank you, counsel, for your arguments this morning. The case is submitted, and you may stand aside.